IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

OMAR SAUNDERS,

              Petitioner,

    v.

STEPHEN D'ILLIO, et al.,

              Respondents.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 15-2683 (JBS)

**OPINION**

---

APPEARANCES:

Omar Saunders, Petitioner *pro se*
500625/320329C
East Jersey State Prison, Lock Bag-R
1100 Woodbridge Avenue
Rahway, New Jersey 07065

Linda A. Shashoua, Esq.
Camden County Prosecutor's Office
25 North Fifth Street
Camden, New Jersey 08102
    Attorney for Respondents Stephen D'Illio and the Attorney
    General of the State of New Jersey

**SIMANDLE, District Judge:**

**I.    INTRODUCTION**

      Petitioner Omar Saunders has submitted a petition for a
writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Pet., ECF
No. 1.) Respondents Stephen D'Illio and the Attorney General of
the State of New Jersey oppose the petition. (Answer, ECF No.
9). For the reasons stated herein, the petition shall be denied
and no certificate of appealability shall issue.

## II. BACKGROUND

In the opinion affirming Petitioner's conviction on direct appeal, the New Jersey Superior Court, Appellate Division provided the following summary of the facts underlying Petitioner's conviction:[1]

> On the evening of May 31, 2002, four young men, all Camden residents and friends, went to a club in Philadelphia, Pennsylvania. They were defendant [Petitioner Omar Saunders, hereafter "Petitioner"], Donnell Jakes, Jose Alvarez, and Angelo Lopez. They went in Alvarez's car, a 1991 white Chevy Lumina. [Petitioner] was wearing dark blue shorts, a white t-shirt, and a white "do rag." At the club, Jakes suggested that [Petitioner] was not able to hold his liquor, and the two argued. Alvarez and Lopez intervened. When the four men left the club, [Petitioner] and Jakes argued again over who should drive home, Jakes contending that [Petitioner] was too drunk to drive. Alvarez directed that [Petitioner] drive. During the trip, [Petitioner] and Jakes resumed the argument, calling each other names, and threatening each other. . . .
>
> When the group returned to Camden, they made a stop at a bar, and then dropped Lopez off at his home. [Petitioner] then stopped the car near the intersection of Pierce and North 26th Streets.
>
> [Petitioner] got out of the car and walked toward a nearby corner, while Alvarez and Jakes walked to a grassy area to urinate. [Petitioner] had left the sight of the other men. Alvarez walked to the corner and looked up and down the block, but could not see [Petitioner]. Standing at the corner, Alvarez began yelling and screaming [Petitioner's] name. According to Alvarez,

---

[1] Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), state court factual findings are presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). As Petitioner has not rebutted the factual findings of the Superior Court of New Jersey by clear and convincing evidence, this Court will rely on those findings.

[Petitioner] was holding a bottle of Corona beer. While
Alvarez was in that location calling for [Petitioner],
Jakes remained near the car.

A few minutes later, Alvarez saw [Petitioner] running
down the block toward him. Alvarez asked [Petitioner]
for his car keys. When [Petitioner] ran past Alvarez,
he shoved the keys at Alvarez and continued on toward
Jakes.

When [Petitioner] reached Jakes, he began to talk to
him, then put his arm around Jakes's shoulders, hugged
him and began walking in Alvarez's direction. Suddenly,
[Petitioner] spun around, removed a gun from his pocket,
and shot Jakes twice in the head at point-blank range.
When Jakes fell to his knees, [Petitioner] fired one
more shot. It was later determined that two gunshot
wounds entered Jakes's head near his right ear, causing
his death. The third shot grazed the front of his
throat.

[Petitioner] lived in the immediate area with his
father, Alphonso Harris, at 1123 North 26th Street. When
a backyard light turned on, [Petitioner] ran up Pierce
Street around the corner and down North 26th Street, in
the direction of his home. Alvarez got into his car and
circled the area for twenty to thirty minutes to see if
Jakes was getting help. Alvarez claimed that when he
saw police arrive on the scene, he left the area rather
than talking to them because he was on parole and did
not want to be caught out after hours.

The shooting occurred in the early morning hours of June
1, 2002, between 3:00 and 3:30 a.m. Later that morning,
[Petitioner] approached Alvarez in Alvarez's backyard,
and asked him if he had talked to anyone about what
happened the night before. He told Alvarez, "we been
friends for a long time, I know where you rest your head
at, and I know where your son go to school at." Alvarez
interpreted those comments as a threat. [Petitioner]
left.

Alvarez later told his sister what happened and, on her
advice, Alvarez went to the prosecutor's office on June
3, 2002, and told them about the shooting. He consented
to have his car searched, and he agreed to place a cell

3

phone call to [Petitioner] and allow investigators to record the conversation.

Throughout the conversation (the tape recording of which was played for the jury and placed in evidence, along with a transcript, which is in the appellate record), [Petitioner] repeatedly told Alvarez that he wanted to meet with him in person. He suggested they needed to get their stories straight. At the beginning of the conversation, Alvarez accused [Petitioner] of "pop[ping] that boy," but [Petitioner] denied it. Later, Alvarez said, "You wild out on the kid you know what I mean?" [Petitioner] responded, "True and deed now listen." . . . [U]sing street jargon, Alvarez asked [Petitioner] whether he threw the gun away, to which [Petitioner] responded, "Hell yeah!"

Alvarez met again with investigators on June 12, 2002, and gave a further statement, acknowledging that some of the information he had previously provided was not accurate, including where he was standing when the shooting took place. Alvarez testified for the State at trial, relating the events in the manner as we have described them.

Lopez also testified for the State. He described the argument between [Petitioner] and Jakes regarding who would drive home. According to Lopez, [Petitioner] said to Jakes, "I'm letting you live right now. I'll kill you." Lopez said that he and Alvarez tried to make peace, but [Petitioner] continued to instigate a fight with Jakes.

Three individuals who lived in the immediate area of the shooting testified for the State. David Monserrate said that at about 3:00 a.m. on June 1, 2002, he heard someone on the corner outside screaming, calling out for someone. He looked out his window and saw a heavyset black man wearing jean shorts, a white shirt and a white hat walking down 26th Street toward the corner. A few minutes later, he heard four gunshots. He then saw the same individual running up the street in the opposite direction. When Monserrate looked out his back window, he saw Jakes lying on the ground.

Paul Rodriguez woke up around 3:30 a.m. when he heard dogs howling. Almost immediately, he heard three

gunshots. He looked out his window and saw a white, four-door car parked near his house. An individual hurriedly got into it and drove away. Aida Rodriguez testified that she heard and saw the same thing. She added that after the police arrived she saw the white car driving slowly around the neighborhood, passing nearby three times, turning its headlights off as it neared the crime scene.

Investigator Ronald Moten of the Camden County Prosecutor's Office went to the crime scene. He found an empty shell casing near Jakes's body and a Corona beer bottle with some beer still in it across the street. Efforts to obtain fingerprints or DNA evidence from either item were unsuccessful. No murder weapon was ever recovered, and an examination of Alvarez's car produced no relevant evidence.

According to [Petitioner's] father, [Alphonso] Harris, he heard [Petitioner] come in around 3:00 a.m. He went downstairs and saw [Petitioner] eating a snack at the dining room table. Because [Petitioner] was intoxicated, Harris helped him up to his bedroom, took his sneakers off and "almost put him to bed." He later checked on [Petitioner] several times, but [Petitioner] was "out like a light." When Harris woke up later that morning, [Petitioner] was gone.

Two days later, . . . Harris went to Philadelphia to meet with [Petitioner], who told him Jakes had been killed and there were rumors that [Petitioner] was involved in the death. [Petitioner] told Harris he and Jakes had been arguing on the night of the murder and he had threatened Jakes. He explained, however, that the argument did not "go anywhere" and he did not shoot Jakes. He said Lopez started rumors about his involvement in Jakes's death by telling people about the argument. . . .

The investigation went cold for about six months, until December 12, 2002, when investigators learned [Petitioner] was in custody on unrelated charges in Vineland. Moten and another investigator went to Vineland to talk to [Petitioner]. As they entered the interrogation room, [Petitioner] blurted out, "I don't own a gun now and I've never owned a gun." He continued, "Donnell [Jakes] and me not only argued at the club . .

. that night, but . . .we had several arguments and we
made peace and everything was dobby." [Petitioner] said
he would never shoot his friend over something as trivial
as who was driving the car.  He said that Jakes's family
"kicked my door in looking for me and that was-and that
is why I moved my family out of Camden."

[Petitioner] did not testify at trial.  He called his
father[, Alphonso Harris] as a witness.  Harris
testified that no one threatened him in connection with
Jakes's murder and no one kicked in the door of his home,
where he and [Petitioner] lived.  When asked if he ever
told police that [Petitioner] complained about being
threatened, Harris responded: "This is why [Petitioner]
wasn't coming back-that's why he didn't come home."  He
admitted, however, that he never told the police that
[Petitioner] was threatened.

*State v. Saunders*, No. A-1798-04T4, 2008 WL 538970, at *1-4

(N.J. Super. Ct. App. Div. Feb. 29, 2008).

As further explained by the Appellate Division, "[t]he

defense strategy at trial was to attempt to raise a reasonable

doubt that [Petitioner] killed Jakes by suggesting that Alvarez

killed him."  *Id.* at *4.  (*Accord* July 1, 2014 Trial Tr. 32:24-

33:4, ECF No. 9-38 (defense counsel stating, during closing,

that "it's not our job to prove that Jose Alvarez killed anybody

back on June 1st, 2002.  I think you've had the opportunity to

meet a murder[er] in this courtroom.  I just don't believe that

he's [Petitioner].");  *but cf.* Jul 9. 2010 PCR Hr'g Tr. 53:25-

55:4, ECF No. 9-44 (defense counsel testifying, during

evidentiary hearing that "[Petitioner's] defense in the case was

that he was not present at the time the decedent was actually

shot. He had been . . . dropped off at home before the shooting actually took place.").)

On July 7, 2004, *i.e.*, the ninth day of trial, the jury found Petitioner guilty of the first-degree murder of Donnell Jakes, N.J. STAT. ANN. § 2C:11-3a(1) or (2) (Count One); second-degree possession of a handgun for an unlawful purpose, N.J. STAT. ANN. § 2C:39-4a (Count Two); third-degree unlawful possession of a handgun, N.J. STAT. ANN. § 2C:39-5b (Count Three); third-degree terroristic threats, N.J. STAT. ANN. § 2C:12-3a or 3b (Count Four); third-degree hindering apprehension or prosecution by concealment or destruction of evidence, N.J. STAT. ANN. § 2C:29-3b(1) (Count Five); third-degree tampering with witnesses and informants, N.J. STAT. ANN. § 2C:28-5a(1) (Count Seven); and second-degree certain persons not to have weapons, N.J. STAT. ANN. § 2C:39-7 (Count Eight). (*See*, *e.g.*, July 7, 2004 Trial Tr. 11:12-17:3, 65:24-67:8, ECF No. 9-40.) The jury acquitted Petitioner of third-degree hindering apprehension or prosecution by preventing or obstructing a witness from providing testimony, N.J. STAT. ANN. § 2C:29-3b(2) and (3) (Count Six). (*See*, *e.g.*, *id.* at 15:13-16:3.) On October 7, 2004, the trial court sentenced Petitioner to an aggregate term of thirty-five years' imprisonment, with an 85% parole disqualifier. (*See*, *e.g.*, Oct. 7, 2004 Sentencing Tr. 4:10-5:11, ECF No. 9-42.)

Petitioner appealed his conviction and sentence to the Appellate Division, arguing, *inter alia*, that the trial court: (i) erroneously excluded a portion of Alphonso Harris's December 12, 2003, statement to investigators from being introduced into evidence at trial[2] (*see* Pet'r's Appeal Br. at Point II, ECF No. 9-5); (ii) erred in precluding Mr. Harris from testifying at trial that on June 3, 2002, Petitioner told Mr. Harris that he had left the Camden area out of fear of retaliation from the victim's family (*see id.*); and (iii) improperly permitted extraneous considerations about the jurors' personal safety to factor into their deliberations. (*See id.* at Point III.)

The Appellate Division affirmed Petitioner's conviction and sentence on February 29, 2008. *Saunders*, 2008 WL 538970, at *17. The New Jersey Supreme Court denied certification of Petitioner's direct appeal on September 5, 2008. *State v. Saunders*, 957 A.2d 1170 (N.J. 2008) (table).

Petitioner thereafter filed a post-conviction relief ("PCR") petition in the state court challenging, *inter alia*, his trial counsel's: (i) failure to call four individuals as witnesses during trial; and (ii) failure to interview three of

---

[2] Specifically, that portion in which Mr. Harris relayed to investigators that his son told him on June 3, 2002: "Dad, I can't go back to Camden. He says his says [Jakes's] partner's looking for me to shoot me, to bang me. . . . They actually think that I'm the one that . . . murdered [Jakes]." *Saunders*, 2008 WL 538970, at *12.

those individuals before trial. (*See* Pet'r's PCR Brs. ECF Nos. 9-11, 9-12, and 9-14.) The PCR court held an evidentiary hearing regarding these claims on July 9, 2010. (PCR Hr'g Tr., ECF No. 9-44.) The PCR court issued a written opinion and order denying Petitioner's PCR petition on January 14, 2011. (ECF No. 9-16.)

The Appellate Division affirmed the denial of Petitioner's PCR petition "substantially for the reasons set forth by [the PCR court] in [its] comprehensive and thorough twenty-page written decision." *State v. Saunders*, No. A-6164-10T3, 2014 WL 1686841, at *2 (N.J. Super. Ct. App. Div. Apr. 30, 2014). The New Jersey Supreme Court denied certification of Petitioner's PCR appeal on January 7, 2015. *State v. Saunders*, 104 A.3d 1077 (N.J. 2015) (table).

Petitioner filed his § 2254 petition on April 14, 2015. (ECF No. 1.) On July 13, 2015, this Court entered an order requiring Respondents to file an answer addressing the merits of Grounds One, Two, and Three of Petitioner's habeas petition.[3] (ECF No. 4.) Respondents filed their answer on September 24, 2015. (ECF No. 9.)

---

[3] Petitioner failed to submit substantive information in support of the claims raised in Ground Four of his petition, as required by the Court's April 29, 2015 Order. (*See* Apr. 29, 2015 Order, ECF No. 3.) Ground Four has therefore been waived by Petitioner. (*See* July 13, 2015 Order, ECF No. 4.)

On January 27, 2016, Petitioner filed a motion to amend and supplement his habeas pleadings. (ECF No. 16.) On September 7, 2016, the Court granted the motion in part and permitted Petitioner to amend his petition to include additional arguments and facts with respect to Ground Three only, *i.e.*, as to Petitioner's previously asserted ineffective assistance of counsel claim.[4] (Sept. 7, 2016 Op. and Order, ECF Nos. 19 and 20, respectively.)

## III. STANDARD OF REVIEW

28 U.S.C. § 2254 permits a federal court to entertain a petition for writ of habeas corpus on behalf of a person in state custody, pursuant to the judgment of a state court, "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

With respect to any claim adjudicated on the merits by a state court, the writ shall not issue unless the adjudication of the claim:

---

[4] The Court denied that portion of Petitioner's motion seeking to assert an additional prosecutorial misconduct habeas claim as time-barred under AEDPA's one-year statute of limitations. (Sept. 7, 2016 Op. 6-8, ECF No. 19.) In so doing, this Court noted that "[n]one of the facts alleged in the proposed amendment [could] be said to have a 'common core of operative facts' with [Petitioner's] original [habeas] claims" and that "allowing [that] amendment would permit Petitioner to evade AEDPA's statute of limitations." (*Id.* at 8.)

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

"[A] state-court decision is an unreasonable application of clearly established [Supreme Court] precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." *White v. Woodall*, 134 S. Ct. 1697, 1706, *reh'g denied*, 134 S. Ct. 2835 (2014). This Court must presume that the state court's factual findings are correct unless Petitioner has rebutted the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV. ANALYSIS

Petitioner raises the following points for this Court's review:

> Ground One: The trial court erroneously excluded statements of [Petitioner] to Alphonso Harris and of Harris to investigators which were admissible under the "Opening the Door Doctrine," N.J.R.E. 106, as prior inconsistent and prior consistent statements, and as statements under the state of mind exception to the hearsay rule.
>
> Ground Two: The trial court permitted and facilitated the interjection of extraneous considerations into the jury deliberations.
>
> Ground Three: The trial court erred in denying [Petitioner's PCR petition] since [Petitioner] failed to receive adequate legal representation from trial counsel.

(Pet. at Addendums C-E, ECF No. 1-1 (capitalization in original omitted).)

### A. Evidentiary Rulings Precluding Admission of Certain Proffered Statements of Alphonso Harris

In Ground One, Petitioner asserts that the trial court erred by: (i) refusing to admit a portion of the December 12, 2003, statement in which Petitioner's father, Mr. Harris, relayed to investigators that Petitioner told him on June 3, 2002, that Petitioner had left the Camden area out of fear of retaliation by associates of the victim; and (ii) precluding Mr. Harris from testifying during trial that Petitioner also told him on June 3, 2002, that Petitioner fled because the family of the victim was similarly looking for Petitioner for retaliatory

purposes.  (*See* Pet. at Addendum C, ECF No. 1-1; *see also*

Pet'r's Appeal Br. at Point II, ECF No. 9-5.)  Petitioner claims

that both of these statements were admissible under a myriad of

state law evidentiary rules.[5]  (*See* Pet. at Addendum C.)

    All of the arguments advanced by Petitioner in Ground One

were examined in great detail – and rejected – by the Appellate

Division on direct appeal.  *See Saunders*, 2008 WL 538970, at

*11-16.  Indeed, that court provided an extensive and detailed

analysis as to why: (i) the exclusion of both of Mr. Harris's

proffered "double hearsay statements" did not prejudice

Petitioner because each represented "cumulative evidence of

[Petitioner's] explanation for his flight[,]" *id.* at *13-14, 16;

and (ii) the exclusion of this evidence was appropriate under

the myriad of state evidentiary rules raised in Ground One.  *Id.*

at *14-16 (setting forth reasons why the trial court did not err

in refusing to admit the challenged statements of Mr. Harris:

(i) under the "opening the door" doctrine; (ii) pursuant to the

"doctrine of completeness", codified at N.J.R.E. 106; (iii) as

---

[5]  More specifically, Petitioner asserts that both statements
should have been admitted at trial:  (i) under the "Opening the
Door Doctrine"; (ii) pursuant to Rule 106 of the New Jersey
Rules of Evidence; (iii) as prior inconsistent and prior
consistent statements; and (iv) as statements under the state of
mind exception to the hearsay rule.  (Pet. at Addendum C; *see
also* Pet'r's Appeal Br. at Point II.)

inconsistent prior statements; and (iv) under the "state of mind" exception to the rule against hearsay).

After closely reviewing the transcripts of Mr. Harris's testimony at trial (*see* June 30, 2004 Trial Tr. vol. 1, 62-200, ECF No. 9-36; *id.* at vol. 2, 203-69, ECF No. 9-37), this Court is unable to find fault with any portion of the Appellate Division's reasoning affirming the trial court's evidentiary rulings. Indeed, in light of the body of evidence presented over the course of nine days of trial, this Court wholly agrees that both of Mr. Harris's excluded double hearsay statements represented "cumulative evidence of [Petitioner's] explanation for his flight[,]" *Saunders*, 2008 WL 538970, at *14, and that the exclusion of this evidence did not prejudice Petitioner.

More importantly, even if this Court disagreed with the state courts' evidentiary rulings – and it does not – the trial court's purported violations of state evidentiary rules do not provide a basis for this Court to grant habeas relief. *See*, *e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Wilson v. Vaughn*, 533 F.3d 208, 213 (3d Cir. 2008) ("Admissibility of evidence is a state law issue.").

Indeed, "[u]nder AEDPA, an application for habeas relief shall not be granted for any claim adjudicated 'on the merits'

in state court unless the state court's adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established *Federal law*.'" *Johnson v. Lamas*, 850 F.3d 119, 133–34 (3d Cir. 2017) (quoting 28 U.S.C. 2254(d)(1)) (emphasis added). In other words, a state court's erroneous evidentiary ruling is not, in and of itself, grounds for habeas relief. *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997) ("To obtain habeas corpus relief[, a petitioner] must demonstrate that the mistake deprived him of a right which he enjoyed under the Constitution, laws, or treaties of the United States."); *see also* 28 U.S.C. § 2254(a). Habeas relief is, however, warranted when a state court's evidentiary decision was so arbitrary or prejudicial that it rendered the entire trial fundamentally unfair, thereby violating a petitioner's due process rights. *See*, *e.g.*, *Romano v. Oklahoma*, 512 U.S. 1, 12–13 (1994); *see also Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001) (evidentiary error rises to the level of a due process violation only when "it was of such magnitude as to undermine the fundamental fairness of the entire trial"). Notably, "the category of infractions that violate 'fundamental fairness' [is] "very narrow[]." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

Here, Petitioner cites no federal precedent that constitutionally entitles him to present the evidence excluded

by the trial judge, and he points to no defense under federal law that he was deprived of by the state courts' evidentiary rulings. *Rosemeyer*, 117 F.3d at 111. This Court is similarly unable to find any basis in the record for it to conclude that the exclusion of Mr. Harris's double hearsay statements rendered Petitioner's entire trial fundamentally unfair.

In sum, to the extent it was raised as a federal claim, Ground One fails to demonstrate a constitutional violation. As such, and for the additional reasons set forth above, the Court will deny habeas relief as to Ground One.

### B.    Jurors' Safety Concerns

Petitioner, in Ground Two, asserts that the trial court improperly permitted jurors' concerns about personal safety to factor into their deliberations. (Pet. at Addendum D, ECF No. 1-1; *see also* Pet'r's Appeal Br. at Point III, ECF No. 9-5.) The legal argument presented by Petitioner in support of Ground Two, reads, in its entirety, as follows:

> The trial court permitted interjection of extraneous considerations into the jury deliberations by failing to investigate the jurors' expressed concern for their physical safety, by indicating to the jury during their deliberations that they were in danger, and by failing to instruct the jurors that any concerns for their personal safety should play no role in their deliberations. [Petitioner] was greatly prejudiced by the court's findings, and his convictions must be reversed.

(Pet. at Addendum D.)

Petitioner does not reference any specific incident or cite to any facts which support his allegations of juror bias. Nonetheless, it is clear that Petitioner is alluding to an incident that occurred during jury deliberations on July 6, 2004. (*See* Pet'r's Appeal Br. at Point III.)  On that date, the jury presented the court with a note stating that:  "The jurors are concerned regarding personal safety after the verdict is read.  How can [the court] guarantee the safety of jurors after the verdict?"  (July 6, 2004 Tr. 28:25-29:3, ECF No. 9-39.)  The trial judge explained that this note was attributable to the jurors' awareness "that the families of both Petitioner and victim] are in the courtroom . . . so [the jurors are] concerned whichever way this goes."  (*Id.* at 28:20-28:23.)

The transcript of court proceedings on that date makes clear that the trial judge, in addressing this issue with counsel, was keenly aware that these safety concerns had the potential to affect the jury's deliberative process, and went to great lengths to ensure that these concerns played no role in jury deliberations.  (*See id.* at, *e.g.*, 31:24-2 ("this addresses your concern which I think is very valid . . . that [the jurors'] underlying safety concerns not [a]ffect their deliberative process"), 47:3-47-7 ("I [as the trial judge] have an obligation [to ensure] that we have deliberations that occur in an environment . . . which [is] fair and impartial"); *accord*

*id.* at 47:8-48:24, 50:23-55:9.)  The record also unquestionably demonstrates that the subsequent actions of the trial judge to address the jurors' safety concerns were undertaken with the express input of defense counsel, who explained that he was "extremely, extremely concerned [about] undue emphasis being placed on the safety issue." (*Id.* at 48:25-49:18.)  Indeed, it was defense counsel who implored the court to say as little about the issue of juror safety as possible.  (*Id.* at 48:25-50:11; 52:11-13.)

Ultimately, the trial court cleared the courtroom and spoke to the jurors collectively about their reported safety concerns. (*Id.* at 54:17-55:2.)  Defense counsel agreed that this course of action was appropriate.  (*Id.* at 55:3-5.)  The trial judge then addressed the jury in a manner that was fully consistent with defense counsel's recommendation that the court assure the jurors of their safety without overemphasizing the issue.  (*Id.* at 59:1-60:15.)  Tellingly, defense counsel did not object to any portion of this statement.

On direct appeal, Petitioner presented the exact claims regarding potential juror bias, *verbatim*, that he now presents in Ground Two.  (*Compare* Pet. at Addendum D *and* Pet'r's Appeal Br. 77.)  The Appellate Division rejected Petitioner's juror bias arguments, explaining:

that the manner in which [the trial court] addressed
this issue was entirely appropriate. Further, [the
trial court] addressed the issue in a manner completely
consistent with [Petitioner's counsel's] requests and
recommendations. Trial court actions which were
induced, encouraged or acquiesced in or consented to by
defense counsel ordinarily will not form the basis for
reversal on appeal. *State v. Harper*, 128 N.J. Super.
270, 277 (App. Div.), *certif. denied*, 65 N.J. 574 (1974).
"The doctrine of invited error operates to bar a
disappointed litigant from arguing on appeal that an
adverse decision below was the product of error, when
that party urged the lower court to adopt the proposition
now alleged to be error." *Brett v. Great Am. Recreation,
Inc.*, 144 N.J. 479, 503 (1996).

*Saunders*, 2008 WL 538970, at *16.

Respondents assert that in light of the foregoing facts,
Ground Two of Petitioner's habeas petition is barred "by virtue
of the doctrine of invited error." (*See* Resp'ts' Answer 49–50,
ECF No. 9.) Respondents further assert that the claims
presented by Petitioner in Ground Two are otherwise "without
merit" because the jurors' purported safety concerns were both
adequately addressed by the trial judge and in no way prevented
the jurors from rendering a fair and impartial verdict. (*Id.* at
49–65.) For the reasons discussed *infra*, the Court agrees on
both points.

1.    *The Invited Error Doctrine*

The doctrine of invited error prevents a habeas petitioner
from raising a claim challenging an action of the trial court
which was invited or induced by that petitioner or by that
petitioner's attorney. *See, e.g., United States v. Maury*, 695

F.3d 227, 256-57 (3d Cir. 2012); *see also Cusumano v. McFarland*, No. 1:04-cv-5080 (RBK), 2006 WL 1455785, at *4-5 (D.N.J. May 18, 2006). This doctrine provides an independent basis for this Court to reject claims raised in § 2254 habeas matters. *See, e.g.*, *York v. O'Llio*, No. 2:13-cv-7609 (JLL), 2016 WL 5938700, at *10-11 (D.N.J. Oct. 11, 2016), *cert. of appealability denied* (3d Cir. Nov. 3, 2016); *Burns v. Warren*, No. 1:13-cv-1929 (RBK), 2016 WL 1117946, at *28-29 (D.N.J. Mar. 22, 2016); *Reddick v. Warren*, No. 2:12-cv-7875 (SDW), 2016 WL 29261, at *12 n.3 (D.N.J. Jan. 4, 2016); *Cusumano*, 2006 WL 1455785, at *4-5.

Here, to the extent Petitioner's claims regarding jurors' purported safety concerns might otherwise be found to have merit, those claims would still remain subject to rejection under the invited error doctrine. Indeed, the trial court proceedings cited above unquestionably demonstrate: (i) that the trial judge requested and received the input of Petitioner – through his counsel – on how to address the jurors' purported safety concerns; (ii) the trial court treated defense counsel's input on this issue as paramount; (iii) that the subsequent actions of the trial court were, first and foremost, done to limit any potential bias against Petitioner; and (iv) that these actions were undertaken in accordance with defense counsel's suggestions.

Moreover, there is absolutely nothing in the record which suggests that Petitioner – or his counsel – subsequently expressed any dissatisfaction with the course taken by the trial court, much less lodged any formal objection. Indeed, because "Petitioner, through counsel, consented to and approved of the course of action taken . . . he cannot [now] cry foul as to the action in question." *Reddick*, 2016 WL 29261, at *12 n.3.

2. *The Merits of Petitioner's Juror Bias Claim*

Petitioner does not cite to any federal law or constitutional provision in support of his overarching claim that "the trial court permitted and facilitated interjection of extraneous considerations into the jury deliberations." (Pet. at Addendum D (capitalization in original omitted).) The Court nonetheless recognizes that the arguments advanced by Petitioner in Ground Two are rooted in his Sixth Amendment "right to . . . trial[] by an impartial jury." U.S. Const. amend. VI. This right is applicable to a criminal defendant in state court through the Fourteenth Amendment. *See Ristaino v. Ross*, 424 U.S. 589, 595 n.6 (1976) (citing *Duncan v. Louisiana*, 391 U.S. 145 (1968)). Principles of due process also guarantee a defendant an impartial jury. *Id.* (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).

Relevant Supreme Court precedent makes clear that jurors are presumed to be impartial and are required to "render a

verdict based on the evidence presented in court." *See Irvin*, 366 U.S. at 723. In *Smith v. Phillips*, 455 U.S. 209 (1982), the Supreme Court held that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Id.* at 217. Instead, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

In *Mu'Min v. Virginia*, 500 U.S. 415 (1991), the Court stressed "the wide discretion granted to the trial court in . . . areas of inquiry that might tend to show juror bias." *Id.* at 427. *Accord Government of the Virgin Islands v. Dowling*, 814 F.2d 134, 137 (3d Cir. 1987) ("the trial judge develops a relationship with the jury during the course of a trial that places him or her in a far better position than an appellate court to measure what a given situation requires."). And in *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court emphasized that the jury's acquittal of the defendant on nine counts indicated a fair-minded consideration of the issues. *Id.* at 383.

Here, the record clearly demonstrates that the trial judge responded to jurors' purported safety concerns in a manner which was "ever watchful to prevent prejudicial occurrences." *Smith*,

455 U.S. at 217. Moreover, the record is completely devoid of any indication that the jurors' safety concerns caused them to render a verdict based on anything other than the evidence presented in court. *See*, *e.g.*, *United States v. DiSalvo*, 34 F.3d 1204, 1225 (3d Cir. 1994) ("[J]urors' expressions of fear or apprehension of a defendant do not, *per se*, establish juror bias"); *United States v. Watchmaker*, 761 F.2d 1459, 1466 (11th Cir. 1985) ("Discussions among the jurors as to their fear of [retaliation from defendants and their associates] are not inappropriate, so long as such discussions do not lead them to form an opinion of the defendants' guilt or innocence of the offenses charged."); *see also United States v. Thornton*, 1 F.3d 149, 155-56 (3d Cir. 1993) (affirming trial judge's refusal to individually *voir dire* jurors after some members expressed general concerns about their safety). Indeed, the acquittal of Petitioner on one of eight charges is further indication that the jury fairly considered the evidence in the case and that they had not formed an opinion of guilt prior to deliberations. *Skilling*, 561 U.S. at 383; *Hill v. D'Llio*, No. 1:14-cv-5990 (NLH), 2016 WL 2943815, at *6 (D.N.J. May 20, 2016).

In light of the foregoing, the Appellate Division's rejection of Petitioner's juror bias claims was not contrary to, nor an unreasonable application of, clearly established Supreme

Court precedent.  As such, and for the additional reasons detailed above, the Court will deny habeas relief on Ground Two.

### C.    Ineffective Assistance of Counsel

In Ground Three, Petitioner asserts that his trial counsel, Wayne Powell, was ineffective for failing to call four individuals as witnesses during trial.  (*See* Pet'r's Supp. Habeas Br. at Point II, ECF No. 16-2.)  Petitioner relatedly claims that Mr. Powell was ineffective for failing to interview three of those witnesses prior to trial.  (*Id.*)

### 1.    *Ineffective Assistance of Counsel Claims Generally*

Claims of ineffective assistance of counsel are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).  To make out such a claim under *Strickland*, a petitioner first "must show that counsel's performance was deficient.  This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).  Second, a petitioner must additionally demonstrate that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable."  *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

With respect to evaluating whether counsel's performance
was deficient under *Strickland*, the "proper standard . . . is
that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395
F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective
assistance must therefore show that counsel's representation
"fell below an objective standard of reasonableness" under the
circumstances. *Id.* The reasonableness of counsel's
representation must be determined based on the particular facts
of a petitioner's case, viewed as of the time of the challenged
conduct of counsel. *Id.* In scrutinizing counsel's performance,
courts "must be highly deferential [and] must indulge a strong
presumption that counsel's conduct falls within the wide range
of reasonable professional assistance." *Strickland*, 466 U.S. at
689. Again, the habeas petitioner "bears the burden of proving
that counsel's representation was unreasonable under prevailing
professional norms and that the challenged action was not sound
strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986)
(citing *Strickland*, 466 U.S. at 688-689).

Under *Strickland*, a habeas petitioner must also
affirmatively demonstrate that counsel's deficient performance
prejudiced his defense. *Strickland* at 692-93. "It is not
enough for the [petitioner] to show that the errors had some
conceivable effect on the outcome of the proceeding." *Id.* at
693. A petitioner must instead demonstrate that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694; *see also Shedrick*, 493 F.3d at 299.

In addition, "[w]hen a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, '[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable,' which 'is different from asking whether defense counsel's performance fell below *Strickland*'s standard.'" *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). "Federal habeas review of ineffective assistance of counsel claims is thus 'doubly deferential.'" *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

2. *Petitioner's Specific Ineffective Assistance of Counsel Claims*

Petitioner contends that his trial counsel was ineffective for failing to interview – and therefore properly investigate the accounts of – Malcolm Rease, Stephen Chalk, and Sherman Artwell prior to trial. (Pet'r's Supp. Habeas Br. Point II.) Under *Strickland*, defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at

691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* "The failure to investigate a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation," and "the failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *United States v. Travillion*, 759 F.3d 281, 293 n.23 (3d Cir. 2014) (internal quotations omitted); *see also United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (a complete absence of investigation is not a strategic choice made by counsel).

To show prejudice in regards to a claim that counsel conducted an incomplete investigation, a habeas petitioner:

> must make "a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produced a different result."

*United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987)); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("the petitioner has the burden of providing the court with specific information as to what the investigation

would have produced."); *accord United States v. Garvin*, 270 F.
App'x 141, 144 (3d Cir. 2008).

Petitioner further contends that his trial counsel was
ineffective for failing to call Arthur Rease, Malcolm Rease,
Stephen Chalk, and Sherman Artwell as witnesses during trial.
(Pet'r's Supp. Habeas Br. Point II.)  The standard applicable to
claims that counsel was ineffective in failing to call certain
witnesses is similar to the above-referenced failure to
investigate standard.  Again, *Strickland* requires that a
defendant "overcome the presumption that, under the
circumstances, the challenged action might be considered sound
trial strategy." *United States v. Graves*, 613 F. App'x 157, 159
(3d Cir. 2015) (quoting *Strickland*, 466 U.S. at 689) (internal
quotation marks omitted).  When presented with such a claim,
courts are "required not simply to give [the] attorney[] the
benefit of the doubt, but to affirmatively entertain the range
of possible reasons [petitioner's] counsel may have had for
proceeding as [he] did." *Branch v. Sweeney*, 758 F.3d 226, 235
(3d Cir. 2014) (alterations in original) (quoting *Pinholster*,
563 U.S. at 195).

>    3.   *The Specific Information that Messrs. Rease, Mr.*
>         *Chalk, and Mr. Artwell Could Have Provided*

Petitioner asserts that Malcolm Rease, Arthur Rease, and
Stephen Chalk witnessed a physical altercation between the

victim, Donnell Jakes, and the State's star witness, Jose
Alvarez, in the hours before Mr. Jakes was killed. (Pet'r's
Supp. Habeas Br., Pt. II.) Petitioner asserts that had these
individuals been called as witnesses, their testimony about that
incident would have impeached Mr. Alvarez's credibility and
would have further suggested to the jury that Mr. Alvarez had a
compelling motive to kill Mr. Jakes. (*Id.*) Petitioner asserts
that had Mr. Artwell been called as a witness, he would have
testified that Mr. Alvarez told him that Mr. Alvarez dropped
Petitioner off at home prior to the murder of Donnell Jakes and
knew that Petitioner did not kill Mr. Jakes. (*Id.*) Mr. Alvarez
relayed this information to Mr. Artwell when both individuals
were confined in county jail. (*Id.*)

All of Petitioner's current ineffective assistance of
counsel claims were examined in great detail by the PCR court.
That court held an evidentiary hearing on these issues on July
9, 2010. Both Petitioner, and his trial counsel, Wayne Powell
testified during that hearing. At that hearing, both Petitioner
and Mr. Powell confirmed that Mr. Powell received an initial
$5,000.00 payment to represent Petitioner in his criminal trial,
that this was the only fee ever paid to Mr. Powell for that
representation, and that this sum was less than the parties'
agreed-upon retainer of $15,000.00. (PCR Hr'g Tr. 14:3-14,
70:12-19, ECF No. 9-44.)

During the PCR hearing, Mr. Powell also stated that he
spoke with Arthur Rease, Alphonso Harris, and Mr. Harris's
girlfriend prior to trial, and that the substance of those
conversations factored into his decision to have – or not have –
each of those individuals testify at trial.  (*Id.* at 53:1-
56:21.)  Mr. Powell further testified that he advised Petitioner
that he would require additional funds to hire a third-party
investigator to speak with the other potential witnesses
identified by Petitioner.  (*Id.* at 58:18-59:7.)  Mr. Powell
explained that it was his general practice to avoid interviewing
potential witnesses himself because "if they say something on
the witness stand that's inconsistent with [sic] what they told
you[,] it makes you a witness i[n] the case."  (*Id.* at 59:21-
60:2.)  Mr. Powell also explained that Mr. Harris and his
girlfriend were "important enough witness[es] that I felt it was
imperative to [interview them in spite of his general
practice]."  (*Id.*)

In its January 14, 2011 decision denying Petitioner's PCR
application, the PCR court noted that it found that Mr. Powell
"provided credible testimony" during the PCR hearing and that
Petitioner's testimony was "not credible."  (ECF No. 9-16 at 6.)
The PCR court further noted that the testimony from the PCR
hearing demonstrated, *inter alia*:  (i) that Arthur Rease
informed Mr. Powell about a fight between Mr. Alvarez and Mr.

Jakes in the hours before Mr. Jakes's murder (*id.* at 7-8, ¶ 5);

(ii) that Mr. Powell made the decision to not call Arthur Rease

as a witness in light of his criminal history (*id.* at 8, ¶ 7);

and (iii) that Mr. Powell made the decision to not call Mr.

Harris's girlfriend as a witness because she would be unable to

provide testimony useful to Petitioner's defense. (*Id.* at 8, ¶

6.)  The PCR court also considered the substantive information

set forth in the sworn certifications of Messrs. Rease, Mr.

Chalk, and Mr. Artwell, all of which were attached to

Petitioner's PCR brief.[6]  (*See id.* at 13 n.2; *but cf.* Pet'r's

Supp. Br. 28, ECF No. 16-2 (indicating that Petitioner never

provided a certification from Mr. Chalk).)

The PCR court ultimately ruled that Petitioner failed to

demonstrate that he received ineffective assistance of counsel

under either *Strickland* prong. (*Id.* at 16-17.)  With respect to

its determination that Petitioner's counsel's performance was

not deficient, the PCR court noted that "[Mr.] Powell made

strategic judgments with respect to what avenues were worth

pursuing, given the limited funds for investigation.  He

interviewed [three] witnesses personally, and satisfied himself

---

[6]  It appears that copies of those certifications have not been
provided to this Court.  The PCR court, however, characterizes
the contents of the certifications (ECF No. 9-16 at 13-17), and
neither party disputes the accuracy of the PCR court's summaries
of their content.

that the evidence concerning the prior dispute between Alvarez
and the victim was not worth presenting at trial . . ."  (*Id.* at
13.)

The PCR court also found that Petitioner was not prejudiced
by trial counsel's failure to interview and call Messrs. Rease,
Mr. Chalk, and Mr. Artwell at trial.  The PCR court accepted
attorney Powell's testimony that much of the information these
witnesses would allegedly provide was "street chatter" or
"street rumors," and not reliable information he could base his
defense around, which in Powell's judgment would "not help him
in further developing his client's alibi defense."  (*Id.* at 13.)
The PCR court provided an individualized analysis of the
specific facts set forth in each of Messrs. Rease, Mr. Chalk,
and Mr. Artwell's respective certifications which supported this
conclusion.  (*Id.* at 13-17.)

None of the four would-be witnesses was called by
Petitioner at the PCR hearing, so they were not subject to
cross-examination as noted by the PCR court.  (*Id.* at 14.)
Importantly, the PCR court noted "that not one of the four
individuals that provided certifications indicated with any
degree of certainty that they knew a third-party who was

responsible for the murder of Mr. Jakes."[7]  (*Id.* at 16.)  The PCR

court also discounted "much of [Mr.] Artwell's certification

[as] unreliable jailhouse information."[8]  (*Id.* at 15.)  Also,

Powell testified he did not recall the names Sherman Artwell or

Stephen Chalk being given to him by Petitioner.  (*Id.* at 15-16.)

The PCR court, having reviewed the certifications of Arthur

Rease, Malcolm Rease, Sherman Artwell, and Stephen Chalk

containing their alleged knowledge and proposed testimony, found

"that counsel's performance was not deficient, and even if the

court was to conclude such, the alleged information of all four

individuals [Petitioner] claims should have been investigated

---

[7]  None of the foregoing factual findings have been rebutted by
Petitioner, and thus, this Court presumes that these findings
are correct.  28 U.S.C. § 2254(e)(1).

[8]  Although never specifically referenced in the PCR court's
written decision, it bears noting that during the July 9, 2010
PCR hearing, the State questioned Petitioner about the testimony
he provided on behalf of Mr. Artwell in Mr. Artwell's own murder
trial.  (PCR Hr'g Tr. 39:9-14, ECF No. 9-44.)  The State
correctly noted that during Mr. Artwell's trial, Petitioner
testified, *inter alia*, that while he was incarcerated in county
jail, he heard Mr. Artwell's co-defendant in Mr. Artwell's
murder trial, Jonathan Martin, make statements about that murder
which inculpated Mr. Martin and which exculpated Mr. Artwell.
(*See*, *e.g.*, *id*. at 34:14-35:9, 42:2-6.)  The State sought to
introduce Petitioner's prior testimony to show that Mr.
Artwell's proffered evidence to the PCR court should have been
discounted because it was the result of "a quid pro quo"
agreement between Mr. Artwell and Petitioner.  (*Id.* at 37:9-16.)
While the PCR court indicated that this evidence did not get to
the "real issue" that Mr. Artwell "wasn't called [as a witness
in Petitioner's trial]" (*id*. at 38:5-6), this Court notes that
this information also would have made Mr. Artwell's claims to
the PCR court susceptible to an attack of bias.

and called to testify at his trial, would not have changed the outcome of [Petitioner's] trial." (*Id.* at 16-17.) Thus, the PCR court applied both prongs of *Strickland*, *supra*, finding no inadequacy in Mr. Powell's representation and finding no prospect that these witnesses would have produced a different result, especially in the face of evidence of Petitioner's guilt that was "overwhelming." (*Id.* at 16 n.3 (quoting *State v. Saunders,* 2008 WL 538970, at *6 (N.J. Super. Ct. App. Div. Feb. 29, 2008)).

The Appellate Division affirmed the denial of Petitioner's PCR petition "substantially for the reasons set forth by [the PCR court] in [its] comprehensive and thorough twenty-page written decision."[9] *State v. Saunders*, 2014 WL 1686841, at *2 (N.J. Super. Ct. App. Div. Apr. 30, 2014).

It is clear that the PCR court reasonably applied federal law when it determined that trial counsel was not defective in light of the particular facts of Petitioner's case. The record supports the PCR court's finding that Mr. Powell did interview several witnesses before trial. This is therefore not a situation in which there was an absence of investigation. The

---

[9] The Appellate Division prefaced that affirmance by noting that "the issues raised in [Petitioner's PCR] appeal [were] without sufficient merit to warrant discussion in a written opinion. *Saunders*, 2014 WL 1686841 at *2 (citing N.J. Ct. R. 2:11-3(e)(2)).

record also shows that Mr. Powell's failure to interview Stephen
Chalk, Sherman Artwell, and Malcolm Rease was the result of Mr.
Powell's assessment that their testimony would be of limited
value to Petitioner's defense, and that it was economically
unfeasible to retain a third-party investigator to interview
those individuals under the circumstances.  Indeed, it appears
that Mr. Powell provided a vigorous defense for a client with
incredibly limited financial resources, and acted appropriately
in light of that reality.

       This Court is aware that Mr. Alvarez was the only
individual who proffered an eyewitness account of the murder of
Mr. Jakes, and that any evidence that could be used to impeach
Mr. Alvarez's credibility or otherwise rebut those assertions
would have been useful to Petitioner's defense.  Petitioner,
however, in no way suggests that Messrs. Rease, Mr. Chalk, or
Mr. Artwell were present when Mr. Jakes was shot, or that any of
those individuals could provide eyewitness testimony which would
directly contradict Mr. Alvarez's testimony at trial that he
witnessed Petitioner shoot Mr. Jakes.  Indeed, this
uncontroverted fact was expressly noted by the PCR court in
support of its finding that Petitioner was not prejudiced by his
trial counsel's failure to interview Malcolm Rease, Stephen
Chalk, or Sherman Artwell before trial nor by counsel's decision
to not call Arthur Rease, Malcolm Rease, Stephen Chalk, and

Sherman Artwell as witnesses during trial. As such, under the highly deferential standard of review governing ineffective assistance of counsel claims in § 2254 habeas matters, this Court is unable to find that the state courts' determination that Petitioner was not prejudiced by the decisions of his trial counsel set forth in Ground Three represents an unreasonable application of *Strickland* and its progeny.

In short, the state courts' PCR determinations are not contrary to, nor an unreasonable application of, clearly established federal law, nor did they result in a decision based on an unreasonable determination of the facts. As such, the Court will deny habeas relief as to Ground Three.

**D.    Certificate of Appealability**

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right.  As jurists of reason could not disagree with this Court's resolution of the claims, the Court shall deny Petitioner a certificate of appealability.

**V.   CONCLUSION**

For the reasons stated above, the habeas petition is denied.  A certificate of appealability shall not issue.

An accompanying Order will be entered.


**March 12, 2018**                         **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            U.S. District Judge